675 P.2d 1333

**Viorel N. SUCIU and Betty Louise Suciu, husband and wife, Plaintiffs/Appellees/Cross-Appellants,**

**v.**

**AMFAC DISTRIBUTING CORPORATION, a California corporation, Defendant/Appellant/Cross-Appellee.**

**No. 2 CA–CIV 4676.**

Court of Appeals of Arizona, Division 2.

Sept. 13, 1983.

Rehearing Denied Nov. 9, 1983.

Review Denied Jan. 24, 1984.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by Gary F. Howard, Tucson, for plaintiffs/appellees/cross-appellants.

Allen, McClennen & Fels, P.C. by Robert H. Allen, Phoenix, for defendant/appellant/cross-appellee.

## OPINION

HOWARD, Chief Judge.

This is an appeal from a jury verdict awarding appellees $17,260 for breach of an employment contract.

Appellant presents the following issues for review:

"1. Whether the evidence as to the alleged employment contract should have been barred by the parol evidence rule.

2. Even if receipt of parol evidence was proper, whether the alleged contract was void by reason of the uncertainty of its terms in that there was no meeting of the minds as to the nature and character of the services to be performed and as to

the services were to be full-time or part-time.

3. Even if there was a contract for a definite length of time whether plaintiffs suffered any damages because Mr. Suciu earned more from other employment than AMFAC had agreed to pay him.

4. Even if plaintiffs did suffer damages, whether they are barred from recovering any damages because of Mr. Suciu's failure and refusal to make any attempt to mitigate his damages.

5. Whether a new trial should be granted on the ground that the jury verdict must have been the result of passion and prejudice because, in its 30 minutes of deliberation, the jury could not have considered the evidence and the court's instructions as to mitigation of damages."

Appellees have cross-appealed contending the trial court erred in refusing to allow them prejudgment interest and attorney's fees.

The evidence, in the light most favorable to sustaining the jury's verdict, discloses that Central Pipe & Supply Company (Central Pipe) was a corporation wholly owned by Robert Bergman. It got into serious financial difficulties and in January 1979 Bergman, at the suggestion of his bankers, hired 62-year-old Viorel (Vic) Suciu, who had 15 to 20 years of experience "fixing" financially troubled companies, to manage the financial affairs of the corporation. In exchange for his help, Suciu was promised a salary of $40,000 per year, a car, group health and life insurance, and was given 30 per cent of the corporate stock.

It took Suciu about three months to get the company to a break-even point. AMFAC Distributing Corporation (AMFAC), a large conglomerate, had been looking for likely acquisitions and had previously been contacted by Bergman. On May 16, 1979, Bergman and Suciu met with Harry Porter and Frank Torres, vice presidents of AMFAC, and John Richardson, the president of AMFAC, to discuss the possibility of AMFAC acquiring some or all of Central Pipe's assets and on May 23, 1979, an acquisition team consisting of Torres and Porter met with Bergman and Suciu. The negotiations led to an oral agreement whereby AMFAC would take over certain assets and liabilities of Central Pipe for a stated price, leaving Central Pipe, in essence, an empty corporate shell, it being the intent of Bergman and Suciu to use the empty shell and the money received from AMFAC to acquire other businesses.

After a closing schedule was agreed upon, Torres and Porter agreed that AMFAC would keep Suciu as an employee until the end of the year for the transition of the business from Central Pipe to AMFAC. The AMFAC acquisition team also told both Bergman and Suciu that when AMFAC made an acquisition it did not make it with the idea of moving one of their people into the branch but rather what they wanted was local management, with the local flavor and the local "guy" that knew the business to run it autonomously just as though it were his own.

After making the verbal agreements to purchase Central Pipe's assets and to employ Suciu, Torres and Porter flew to Phoenix to close the purchase of a Phoenix plumbing supply operation owned by one Bert Lewin. Torres and Porter never mentioned to Bergman and Suciu that when AMFAC purchased Central Pipe's assets, Lewin would be their boss.

The final documents for the acquisition were drafted by the attorneys for Central Pipe and for AMFAC and were signed on the same day by AMFAC and by Bergman. Torres was present in Tucson as was Lewin, both attending a banquet given by the AMFAC acquisition team for the Central Pipe employees to welcome them to AMFAC. When the banquet was over, Torres left and told Lewin to fire Suciu immediately. Lewin did not get around to firing Suciu until Monday, June 25, 1979, when he told Suciu he was fired and had half an hour to get his desk cleaned up and leave the premises. Suciu protested that he had an agreement to stay on but left anyway.

For the next few months Suciu tried to find the same kind of employment opportu-

nity that he had been involved in for the last 15 to 20 years, in other words, to find a business to "bail out." At the end of 1979, Central Pipe acquired Kasper-Hall Steel, using the money it had acquired from AM-FAC. With the acquisition of Kasper-Hall completed, Central Pipe was able to distribute some of the excess cash to Bergman and Suciu as "salary" for the second half of 1979.

■ AMFAC filed a motion in limine asking the court to preclude the introduction of any testimony concerning the oral contract to keep Suciu as an employee until the end of 1979. It contends that the trial court erred in denying its motion in limine and allowing the introduction and use of such evidence because it violated the parol evidence rule. We do not agree.

Paragraph 12.5 of the agreement between appellant and Central Pipe stated:

"The agreement constitutes and contains the entire agreement of the parties and supersedes any and all prior negotiations, correspondence, understandings and agreements between the parties respecting the subject matter hereof."

Appellant points to this integration clause and to the testimony by Suciu as showing that the written agreement represented the entire agreement and cannot be varied by parol evidence. Suciu testified that he would not have recommended the acquisition if AMFAC had not agreed to keep him on until the end of the year and that Bergman depended on his advice. Appellant's argument is unpersuasive.

The integration clause has no effect on Suciu. He was not a party to the agreement. He was merely a minority shareholder and the transaction was a corporate sale of assets. An analogous situation arose in the case of *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447 (2nd Cir. 1977). There a person named Harold Lee and his sons owned 50 per cent of a liquor distributorship. They sold the business to Seagram and claimed that after the sale Seagram broke an oral agreement that it would give Harold Lee's sons another distributorship. The court stated that the

over-arching question was whether, in the context of the particular setting, the oral agreement was one which the parties would ordinarily be expected to embody in the writing. In holding that it was not, the court stated:

"Here, there are several reasons why it would *not* be expected that the oral agreement to give Harold Lee's sons another distributorship would be integrated into the sales contract. In the usual case, there is an identity of parties in both the claimed integrated instrument and in the oral agreement asserted. Here, although it would have been physically possible to insert a provision dealing with only the shareholders of a 50% interest, the transaction itself was a *corporate* sale of assets. Collateral agreements which survive the closing of a corporate deal, such as employment agreements for particular shareholders of the seller or consulting agreements, are often set forth in separate agreements. See *Gem Corrugated Box Corp. v. National Kraft Container Corp.*, supra, 427 F.2d [499] at 503 ('it is ... plain that the parties ordinarily would not embody the stock purchase agreement in a writing concerned only with box materials purchase terms'). It was expectable that such an agreement as one to obtain a new distributorship for certain persons, some of whom were not even parties to the contract, would not necessarily be integrated into an instrument for the sale of *corporate* assets. As with an oral condition precedent to the legal effectiveness of an otherwise integrated written contract, which is not barred by the parol evidence rule if it is not directly contradictory of its terms, *Hicks v. Bush*, 10 N.Y.2d 488, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962); cf. 3 Corbin on Contracts Sec. 589, 'it is certainly not improbable that parties contracting in these circumstances would make the asserted oral agreement ....' [citation omitted.]" 552 F.2d at 452.

The court also observed that it did not see any contradiction of the terms of the

sale since the written agreement dealt with the sale of corporate assets and the oral agreement with the relocation of the lease. Since the oral agreement did not vary or contradict the contract the court found another reason for affirming the district court's admission of the oral agreement into evidence. This is also the law in Arizona. See *United States Fidelity & Guaranty Co. v. Olds Bros. Lumber Co.,* 102 Ariz. 366, 430 P.2d 128 (1967).

█ Citing 30 Am.Jur.2d Evidence Sec. 1029 (1967), appellant asserts that since Suciu is a third-party beneficiary of the agreement between AMFAC and Central Pipe, he is considered a party for the purposes of the parol evidence rule. We do not agree. Assuming, arguendo, that a shareholder is a third-party beneficiary in a reading of the authorities cited by the encyclopedia to support its broad statement shows that the rule only has application when the third-party beneficiary is attempting to enforce the benefits granted to him under the contract. In such a case the third-party beneficiary can only enforce his right under the contractual terms in the manner and to the same extent as if he had personally entered into and assented to the agreement. See *United States Gypsum Co. v. Gleason,* 135 Wis. 539, 116 N.W. 238 (1908); *Johnston v. Charles Abresch Co.,* 123 Wis. 130, 101 N.W. 395 (1904). As to rights which originate in the relationship established by the written contract or which depend upon it, the rule against varying it applies to a third-party beneficiary. See *Johnston v. Charles Abresch,* supra. However, Suciu was not attempting to enforce any rights which originated in the written contract between AMFAC and Central Pipe. Furthermore, the rule stated by the encyclopedia does not apply where, as here, the oral agreement does not contradict, vary or alter the terms of the written agreement.

█ Appellant contends that the oral contract is void by reason of the uncertainty of its terms since there was no meeting of the minds as to the nature and character of the services to be performed and whether the services were to be full-time or part-time. We do not agree. The testimony of both Bergman and Suciu shows that Suciu was to facilitate the transition of the business from Central Pipe to AMFAC and in so doing to do whatever AMFAC required of him and for whatever length of time was required. For this he was to receive the salary which he was already receiving from Central Pipe. This was sufficiently definite. Employment contracts need not detail every condition of the employment. *Travelers Insurance Co. v. Workmen's Compensation Appeals Board,* 68 Cal.2d 7, 434 P.2d 992, 64 Cal.Rptr. 440 (1967).

█ Appellant contends that appellees were barred from recovering damages because of Suciu's failure to mitigate his damages. Appellant bases this argument on the testimony by Suciu that after June 25, 1979, he did not try to find another job like the AMFAC job. Appellant's argument is spurious. Suciu was supposed to help facilitate the changing of the business from Central Pipe to AMFAC. One cannot seriously argue that it was incumbent on Suciu to find another transitional-type job. Suciu did testify that after he had been terminated he looked for the same kind of business opportunity that he had been involved in for the last 15 or so years, which was "fixing" corporations like Central Pipe or using it as a vehicle to acquire another business and build it up into something worthwhile. It was what his occupation was and there was no evidence to contradict his testimony. The burden here was on AMFAC, as the employer, to show what Suciu could have earned in similar employment in the locality i.e., as a corporate "fixer upper." D. Dobbs, Handbook on the Law of Remedies Sec. 12.25 (1973).

█ We also do not agree with appellant's contention that Suciu was not entitled to any damages since the money he earned after he was discharged exceeded the balance of the amount due under their oral agreement. Again, Dobbs, Sec. 12.25 at 925 correctly states the applicable rule:

"If the employee obtains other employment after a wrongful discharge, he is ordinarily chargeable with the income from that employment, so that his damage claims against his former employer are reduced by what he makes in his new job. This is because the wrongful discharge has ordinarily given him the free time to accept a new job, which becomes a substitute for the old. If the employee accepts a less satisfactory substitute job, he must still deduct the wages from that job from his damages claim. However, the employee may obtain a new job that is not a substitute for the old one. He may obtain a new job that he could also have held while working at the old one. In such a case the employer is not entitled to a credit for income from the new job, since the income it produces was not available as a result of the wrongful discharge."

At the end of December 1979 Central Pipe paid both Suciu and Bergman a sum of money denominated as "salary" for the last half of 1979. There was no evidence that the salary would not have been paid by Central Pipe to Suciu had he continued to work for AMFAC. Suciu testified that he could have done whatever was required for AMFAC, and he would still have earned the money from Central at the end of 1979. In fact, Bergman was paid the same amount of salary, although he did continue to work for AMFAC for the remainder of 1979. It cannot be argued that Suciu's firing by AMFAC made possible his receipt of the salary from Central Pipe.

◼ Lastly, appellant contends that the trial court erred in refusing to grant a new trial on the ground that the jury verdict must have been the result of passion and prejudice because it only deliberated for 30 minutes. We do not agree. The granting or denial of a motion for new trial is with the sound discretion of the trial court. *Erickson v. Waller*, 116 Ariz. 476, 569 P.2d 1374 (App.1977). The appellate court will not upset a trial court's ruling absent a clear showing of abuse of discretion. *Adroit Supply Co. v. Electric Mutu-*

*al Liability Insurance Co.*, 112 Ariz. 385, 542 P.2d 810 (1975). If it appears manifest that the jury was actuated by prejudice or passion, the jury's verdict may not stand. *Mayo v. Ephrom*, 84 Ariz. 169, 325 P.2d 814 (1958). The mere fact that only 30 minutes elapsed from the time the jury retired to deliberate and returned with a verdict does not require a conclusion that passion or prejudice motivated the verdict. Cf. *Stallcup v. Rathbun*, 76 Ariz. 63, 258 P.2d 821 (1953). (where the jury deliberated 34 minutes). The trial court did not abuse its discretion in failing to grant a motion for a new trial.

◼ In their cross-appeal appellees first argue that the trial court abused its discretion in failing to award them attorney's fees under A.R.S. Sec. 12–341.01. We do not agree. The statute providing for attorney's fees is permissive, the awarding of attorney's fees being a matter in the discretion of the trial court. *Autenreith v. Norville*, 127 Ariz. 442, 622 P.2d 1 (1981). The trial judge here thought that there had been a fair dispute on both sides and for that reason did not assess attorney's fees. We cannot substitute our judgment for that of the trial judge and there is nothing presented which shows that the action of the trial judge was an abuse of discretion.

◼ We do agree with appellees' contention that the trial court erred in failing to award them prejudgment interest. A creditor is entitled to interest on his claim prior to judgment, provided such demand is liquidated. The claim is liquidated if the evidence furnishes data which, if believed, make it possible to compute the amount with exactness without reliance upon opinion or discretion. *Costanzo v. Stewart Title & Trust of Phoenix*, 23 Ariz. App. 313, 533 P.2d 73 (1975). The award of pre-judgment interest is a matter of right and not a matter of discretion. *Banner Realty, Inc. v. Turek*, 113 Ariz. 62, 546 P.2d 798 (1976). Appellant contends that since appellees sued for $20,000 and the jury awarded them $17,260 that the damages were unliquidated. We do not agree.

The existence of a difference between the amount of damages claimed and the amount awarded does not preclude the award of prejudgment interest. *Coleman Engineering Co. v. North American Aviation, Inc.*, 65 Cal.2d 396, 420 P.2d 713, 55 Cal.Rptr. 1 (1966); *Overland Machined Products, Inc. v. Swingline, Inc.*, 263 Cal. App.2d 642, 69 Cal.Rptr. 852 (1968); and see also, *Homes & Sons Construction Co., Inc. v. Bolo Corp.*, 22 Ariz.App. 303, 526 P.2d 1258 (1974).

The trial court is directed to modify the judgment to include interest from December 31, 1979, and as so modified, the judgment is affirmed.

HATHAWAY and BIRDSALL, JJ., concur.