IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

DALTON SCOTT STAFFORD and KRISTINE MAJOR STAFFORD,
Parents of JESSE TREY STAFFORD, Deceased, *Plaintiffs/Appellants*,

*v.*

ANNE M. BURNS, M.D. and JOHN DOE BURNS, husband and wife;
EMPOWER EMERGENCY PHYSICIANS, P.C., *Defendants/Appellees*.

No. 1 CA-CV 15-0476
FILED 11-29-2016

---

Appeal from the Superior Court in Maricopa County
No.  CV2013-000019
The Honorable John Christian Rea, Judge

**JURISDICTION ACCEPTED; RELIEF DENIED**

---

COUNSEL

Grysen & Associates, Spring Lake, MI
By B. Elliott Grysen
*Co-Counsel for Plaintiffs/Appellants*

Knapp & Roberts, P.C., Scottsdale
By David L. Abney
*Co-Counsel for Plaintiffs/Appellants*

Jones Skelton & Hochuli, P.L.C., Phoenix
By Eileen Dennis GilBride, Cristina M. Chait
*Counsel for Defendants/Appellees*

---

## OPINION

Presiding Judge Kenton D. Jones delivered the Opinion of the Court, in which Judge Randall M. Howe and Judge Donn Kessler joined.

---

**J O N E S**, Judge:

¶1         Dalton and Kristine Stafford (the Staffords) appeal the trial court's orders denying their motions for new trial and for relief from judgment following a jury verdict in favor of Appellees (collectively, Dr. Burns) on the Staffords' claims for medical malpractice and wrongful death after their son, Jesse, died of a methadone overdose.

¶2         The Staffords argue the trial court erred in instructing the jury, pursuant to Arizona Revised Statutes (A.R.S.) section 12-572(A),[1] that the Staffords bore the burden of proof by clear and convincing evidence because, they contend, Dr. Burns did not provide medical care "in compliance with" the Emergency Medical Treatment and Active Labor Act (EMTALA). *See* 42 U.S.C.A. § 1395dd (West). As set forth below, we hold, as relevant here, the heightened standard of proof for claims against a health professional set forth in A.R.S. § 12-572(A) applies whenever the acts or omissions plaintiff contends were deficient were provided in the course of evaluating and treating a patient in a hospital emergency department.

¶3         The Staffords also argue the court abused its discretion in denying their motion for new trial based upon various administrative and evidentiary rulings, for which we find no error.

¶4         Finally, the Staffords argue the trial court erred in imposing sanctions pursuant to Arizona Rule of Civil Procedure 68(g) because Dr. Burns' pretrial offer of judgment was invalid in that it was not made in good faith. We do not reach the merits of the Staffords' contention because Rule 68(g) contains no such good faith requirement, and we decline to impose one in contravention of the rule's plain language and purpose.

---

[1]         Absent material changes from the relevant date, we cite a statute's current version.

**¶5**        For the reasons stated below, we treat the Staffords' appeal as a petition for special action, accept jurisdiction, and deny relief. Accordingly, the judgment and orders are affirmed.

## FACTS[2] AND PROCEDURAL HISTORY

**¶6**        In the early morning hours of February 5, 2012, Jesse presented at the emergency room of St. Joseph's Hospital after having ingested an unknown quantity of methadone. After several hours of testing, evaluation, and monitoring for a possible methadone overdose, Dr. Burns took over Jesse's care until he was discharged around 1:00 p.m. Jesse was found dead the following day.

**¶7**        In January 2013, the Staffords filed a complaint against Dr. Burns, asserting she negligently caused Jesse's death by wrongfully determining his condition was stable and discharging him prematurely. In response, Dr. Burns asserted she complied with the standard of care and presented evidence suggesting Jesse ingested additional methadone after his discharge that ultimately caused his death.

**¶8**        After a twelve-day trial, the jury returned a defense verdict. The Staffords timely filed motions for new trial and for relief from judgment, which were denied. This appeal followed.

## JURISDICTION

**¶9**        This Court has an independent duty to examine whether it has jurisdiction to consider an appeal. *Stafford v. Farmers Ins. of Ariz.*, 191 Ariz. 464, 465 (App. 1997) (citing *Davis v. Cessna Aircraft Corp.*, 168 Ariz. 301, 304 (App. 1991)). Our appellate jurisdiction is generally limited to issues arising from final judgments disposing of all claims and all parties. *Musa v. Adrian*, 130 Ariz. 311, 312 (1981). A notice of appeal filed before entry of a signed final judgment or resolution of a time-extending motion is a nullity unless and until the final order enters. *See* ARCAP 9(c); *Craig v. Craig*, 227 Ariz. 105, 107, ¶ 13 (2011) (citing *Smith v. Ariz. Citizens Clean Elections Comm'n*, 212 Ariz. 407, 415, ¶ 39 (2006), and *Engel v. Landman*, 221 Ariz. 504, 509, ¶ 13 (App. 2009)); *Tripati v. Forwith*, 223 Ariz. 81, 84, ¶ 15 (App. 2009).

---

[2]        We view the facts and all inferences to be drawn therefrom in the light most favorable to sustaining the jury's verdict and resulting judgment for costs. *Hyatt Regency Phx. Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 123 (App. 1995) (citing *Bradshaw v. State Farm Mut. Auto. Ins.*, 157 Ariz. 411, 414 (1988), and *Rhue v. Dawson*, 173 Ariz. 220, 223 (App. 1992)).

¶10　　　　Here, the Staffords filed two time-extending motions. *See* ARCAP 9(e)(1)(D) (motion for new trial), (E) (motion for relief from judgment). The trial court entered a signed order denying the motion for relief from judgment and denied the motion for new trial in an unsigned minute entry order. Although this Court re-vested jurisdiction in the trial court for the purpose of obtaining a signed, final order corresponding to the minute entry denying the motion for new trial, *see Eaton Fruit Co. v. Cal. Spray-Chem. Corp.*, 102 Ariz. 129, 130 (1967), no such order has been issued. Accordingly, we lack appellate jurisdiction over this appeal.

¶11　　　　Although we do not have appellate jurisdiction, we may, in our discretion, consider the appeal as a petition for special action. *See Grand v. Nacchio*, 214 Ariz. 9, 17, ¶ 20 (App. 2006) (citing *Danielson v. Evans*, 201 Ariz. 401, 411, ¶ 35 (App. 2001), and *Lloyd v. State Farm Mut. Auto. Ins.*, 189 Ariz. 369, 375 (App. 1996)); *see also* A.R.S. § 12-120.21(A)(4) (granting court of appeals jurisdiction to hear special actions "without regard to its appellate jurisdiction"). We elect to do so here. The Staffords present at least two issues of first impression and statewide importance likely to recur. *See Lind v. Superior Court*, 191 Ariz. 233, 236, ¶ 10 (App. 1998) (citing *Moss v. Superior Court*, 175 Ariz. 348, 350 (App. 1993)). Additionally, were we to dismiss the appeal, nothing that may occur in the trial court would likely alter the disposition of the issues raised. *Grand*, 214 Ariz. at 18, ¶ 24. Not wanting to elevate form over substance, we exercise our discretion to treat this appeal as a petition for special action and accept jurisdiction but, as set forth below, deny relief.

## DISCUSSION

### I.　　Application of A.R.S. § 12-572(A)

¶12　　　　A plaintiff must generally prove the elements of his medical malpractice claim by a preponderance of the evidence. *See Harvest v. Craig*, 195 Ariz. 521, 523, ¶ 10 (App. 1999) (citing *Thompson v. Sun City Cmty. Hosp., Inc.*, 141 Ariz. 597, 608 (1984)). In 2009, however, our legislature adopted A.R.S. § 12-572(A), which heightened the burden of proving a malpractice claim against "a health professional . . . who provides or who is consulted to provide services to a patient of a licensed hospital in compliance with [EMTALA]" to clear and convincing evidence. EMTALA is a federal statute enacted to address the growing concern that hospitals were routinely refusing emergency medical treatment to individuals unable to pay for services. *See Eberhardt v. City of L.A.*, 62 F.3d 1253, 1255 (9th Cir. 1995) (citing H.R. Rep. No. 241, 99th Cong., 1st Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 726-27); *Scottsdale Healthcare, Inc. v. Ariz. Health Care Cost*

*Containment Sys. Admin.*, 206 Ariz. 1, 6 n.6, ¶ 20 (2003) (citing *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1165 (9th Cir. 2002)). The Staffords argue the trial court erred in instructing the jury on the clear and convincing burden of proof set forth in A.R.S. § 12-572(A) because, they contend, Dr. Burns was not providing services "in compliance with EMTALA" as another physician had already performed the medical screening and determined Jesse did not have an emergency medical condition. In response, Dr. Burns argues A.R.S. § 12-572(A) applies to "all emergency room services."

**¶13** Although we review a trial court's denial of a motion for new trial and its decision to give a jury instruction for an abuse of discretion, we review *de novo* whether jury instructions accurately state the law. *Delbridge v. Salt River Project Agric. Improvement & Power Dist.*, 182 Ariz. 46, 53 (App. 1994) (citing *Suciu v. AMFAC Distrib. Corp.*, 138 Ariz. 514, 520 (App. 1983)); *State v. Garcia*, 224 Ariz. 1, 18, ¶ 75 (2010) (citing *State v. Martinez*, 218 Ariz. 421, 432, ¶ 49 (2008)); *see also State v. Rios*, 217 Ariz. 249, 250, ¶ 5 (App. 2007). The interpretation and application of statutes also present questions of law which we review *de novo*. *City of Phx. v. Glenayre Elecs., Inc.*, 240 Ariz. 80, 84, ¶ 8 (App. 2016) (citing *First Fin. Bank, N.A. v. Claassen*, 238 Ariz. 160, 162, ¶ 8 (App. 2015)).

**¶14** The heightened burden of proof of A.R.S. § 12-572(A) applies where services are provided "in compliance with EMTALA." EMTALA applies to any individual who comes to a hospital's emergency department for treatment.[3] 42 U.S.C.A. § 1395dd(a). Under EMTALA, the hospital is required to provide appropriate medical screening to determine if an emergency medical condition exists.[4] *Id.* If the patient has an emergency

---

[3] A person "comes to the emergency department" when he "present[s] at a hospital's dedicated emergency department . . . and requests examination or treatment for a medical condition," "present[s] on hospital property . . . other than the dedicated emergency department, and requests examination or treatment for what may be an emergency medical condition," or "[i]s in a ground or air ambulance owned and operated by the hospital for purposes of examination and treatment for a medical condition at a hospital's dedicated emergency department." 42 C.F.R. § 489.24(b).

[4] An "emergency medical condition" is a condition "manifesting itself by acute symptoms of sufficient severity (including severe pain, psychiatric disturbances and/or symptoms of substance abuse) such that the absence

medical condition, the hospital must either provide "such further medical examination and such treatment as may be required to stabilize the medical condition," or, if safe and appropriate, transfer the patient to another facility for stabilizing care.[5]  42 U.S.C.A. § 1395dd(b)(1).  For purposes of EMTALA, a patient is "stabilized" when "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility."  42 U.S.C.A. § 1395dd(e)(3)(B).

¶15        The gamut of services that may be necessary to comply with EMTALA cannot readily be distilled into a universally applicable and finite list, and therefore, the phrase cannot be read narrowly.  To adopt the Staffords' view, the burden of proof against the health care provider would shift from clear and convincing to a preponderance of the evidence the instant: (1) the screening process is completed and reveals the patient does not have an "emergency medical condition" within the meaning of EMTALA, or (2) a patient is stabilized to the point that his condition would not deteriorate during a transfer.  This sort of interpretation is not practical in the context of a person seeking emergency medical care.  The evaluation and treatment of a medical condition is necessarily a fluid process, whereby a patient's status as serious or stable may change from moment to moment.  This is particularly true where the condition qualifies as an emergency under EMTALA — manifesting through acute symptoms, severe pain, and the risk of serious dysfunction or bodily impairment.

¶16        We do not read EMTALA to relieve the hospital emergency department from re-screening, re-evaluating, and even possibly re-treating a patient if his condition changes after an initial status determination.  Indeed, federal courts have held a hospital's duty under EMTALA can continue up to and even after a patient is admitted for inpatient care.  *See,*

---

of immediate medical attention could reasonably be expected to result in — (i) [p]lacing the health of the individual . . . in serious jeopardy; (ii) [s]erious impairment to bodily functions; or (iii) [s]erious dysfunction of any bodily organ or part."  42 C.F.R. § 489.24(b); *see also* 42 U.S.C.A. § 1395dd(e)(1)(A).

[5]        Alternatively, if it is clear from the nature of the person's request for services that the medical condition is not of an emergency nature, "the hospital is required only to perform such screening as would be appropriate for any individual presenting in that manner, to determine that the individual does not have an emergency medical condition."  42 C.F.R. § 489.24(c).  The Staffords do not argue Jesse's request for care falls under this exception.

*e.g.*, *Bryant*, 289 F.3d at 1168 (concluding EMTALA duty ends when a patient is admitted in good faith for inpatient care); *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir. 1990) ("[O]nce a patient is found to suffer from an emergency medical condition in the emergency room, she cannot be discharged until the condition is stabilized, regardless of whether the patient stays in the emergency room."); *see also* 42 C.F.R. § 489.24(a)(1)(ii), (d)(2)(i).

¶17 We reject the Staffords' argument that EMTALA was never implicated during Jesse's stay in the emergency department because he was not diagnosed with an emergency medical condition. First, the Staffords do not identify any record evidence establishing that fact. Furthermore, "emergency medical condition" is defined, specifically, to include "symptoms of substance abuse." 42 C.F.R. § 489.24(b). Viewing the evidence in the light most favorable to sustaining the verdict, as we are required to do, we can reasonably infer otherwise from the evidence that the original emergency room physician chose to keep Jesse for observation and testing over the course of several hours, rather than immediately authorizing his discharge.

¶18 Second, EMTALA applies whenever a person comes to the hospital "for *what may be* an emergency medical condition." 42 C.F.R. § 489.24(b) (emphasis added). Jesse came to the hospital for this precise purpose — seeking evaluation and treatment of *what may have been* an emergency medical condition — after ingesting an unknown quantity of methadone, a dangerous narcotic drug. *See* A.R.S. § 13-3401(20)(k). He was kept in the emergency department for almost twelve hours for observation, testing, and evaluation of physical and psychological concerns — all services required by EMTALA to screen for and stabilize a potentially life-threatening medical condition. *See supra* ¶ 14. If Jesse was misdiagnosed or discharged prematurely, as the Staffords contend, those actions occurred in the course of providing EMTALA-mandated services, A.R.S. § 12-572(A) is directly applicable, and the Staffords were required to prove their claims by clear and convincing evidence. The Staffords cannot both have and eat their proverbial cake by arguing the very acts that define the scope of the protections afforded by A.R.S. § 12-572(A) — screening and treatment — remove Dr. Burns from its protections.

¶19 A broader interpretation is also consistent with the statute's purpose to provide a more inviting legal environment for emergency medical providers, *see* Ariz. S. Fact Sheet, S.B. 1018 (1st Reg. Sess. Jun. 15, 2009) (noting the heightened burden of proof was recommended "to address the state's shortage of emergency and trauma physicians and the

problem of access to emergency care"); *Ariz. Emergency Med. Servs. Access Task Force Rep.*, at 2-3, 15-16 (2006), https://www.acep.org/content.aspx?id=5258, as well as the section heading adopted by the legislature: "Burden of proof for treatment in emergency departments or rendered by on-call providers," *see Bruce v. Charles Roberts Air Conditioning*, 166 Ariz. 221, 225 (App. 1990) (noting that although section headings are not part of the law, they may aid in interpreting otherwise ambiguous language). Although the legislature certainly could have described the extent of the liability protection contained within A.R.S. § 12-572(A) without reference to EMTALA, as the Staffords suggest it should have, the intent of the statute is clear, and the statutory language does not preclude a reasonable interpretation consistent with that intent.

**¶20** Finally, the Staffords argue A.R.S. § 12-572(A) does not apply because they do not specifically reference EMTALA in their pleadings, they have never asked for a determination whether Dr. Burns complied with — or violated — EMTALA, and they have no direct right of action against Dr. Burns for an EMTALA violation.[6] These facts are irrelevant. The reference to EMTALA within A.R.S. § 12-572(A) defines the scope of the liability protection. Under the statute, the relevant inquiry is whether the acts or omissions the plaintiff contends were deficient were provided in the course of evaluating and treating a patient in a hospital emergency department. That is clearly the case here, and the clear and convincing standard articulated in A.R.S. § 12-572(A) applies. Accordingly, we find no error in the trial court's instructions to the jury regarding the burden of proof.

---

[6] The Staffords cite *Moses v. Providence Hospital & Medical Centers, Inc.*, 561 F.3d 573 (6th Cir. 2009), and *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776 (6th Cir. 2003), to support their argument that EMTALA does not apply to their claims. In both cases, the Sixth Circuit Court of Appeals held that stabilizing treatment is required only if the medical providers "actually recognize that the patient has an emergency medical condition." *Moses*, 561 F.3d at 582-85; *Roberts*, 325 F.3d at 786-87. Those holdings are relevant to whether a plaintiff can maintain a federal cause of action for violation of EMTALA, but inapplicable to the question presented here — whether the actions forming the basis of the Staffords' civil negligence claim were performed by Dr. Burns "in compliance with EMTALA."

## II.    Jury Misconduct

**¶21**    The Staffords next argue they were entitled to a new trial because Juror 10 violated the admonition not to discuss the case outside of the jury room. We review a decision to deny a new trial based upon alleged jury misconduct for an abuse of discretion. *State v. Fitzgerald*, 232 Ariz. 208, 210, ¶ 10 (2013) (quoting *State v. Hall*, 204 Ariz. 442, 447, ¶ 16 (2003)).

**¶22**    Throughout the twelve-day trial, the jurors were admonished not to discuss the case outside of the jury room. At the end of the eleventh day, the court reporter advised the trial court she had been in the elevator with several jurors when she heard Juror 10 say "something like — if the parameters were set at 11 to 24, why didn't the alarm go off." The court reporter told the jurors not to talk about the case, and the conversation ended. When questioned by the court, Juror 10 remembered making the statement in the elevator and confirmed no other discussion occurred. He denied having any other conversations about the case outside the jury room. The Staffords were given an opportunity to question Juror 10 further but declined to do so.

**¶23**    The Staffords did, however, move to excuse Juror 10 from further service. After concluding the comment "d[id]n't show that he's made up his mind, . . . [and was] the exact kind of thing [a juror] would say in deliberations," the trial court denied the motion. In denying the Staffords' motion for new trial on the basis of jury misconduct, the court reiterated that:

> while the court was upset with the jury upon receiving the . . . information [regarding Juror 10's elevator comment], after interviewing the juror and learning the details and observing the juror's demeanor, the court concluded that the remark was minor, did not influence the other jurors, and did not indicate any predetermination of the issues by [J]uror 10.

**¶24**    The Staffords now argue Juror 10 "did not belong on the jury panel" because his comment was "probably just the tip of the iceberg of his misconduct — shamelessly committed in a public elevator in the presence of three other jurors and the court reporter," and because his conduct reflects "he was either incapable of following instructions or was deliberately obtuse and contrary." The Staffords also suggest Juror 10 could have assumed it was they who had discovered his misconduct, adding a "'get even' motive to his proven penchant for ignoring the rules."

¶25 Not every violation of the court's admonitions requires dismissal of the juror involved, *see State v. Trostle*, 191 Ariz. 4, 13 (1997), and the trial court is in the best position to determine the effect, if any, of a juror's misconduct, *see Cota v. Harley Davidson*, 141 Ariz. 7, 10 (App. 1984) (citing *State v. Reynolds*, 11 Ariz. App. 532, 535 (1970)). The record reflects only that Juror 10 made a single non-committal comment outside the jury room and immediately discontinued the conversation when reminded to do so. The court determined Juror 10's comment was isolated and innocuous and did not affect his ability to render a fair and impartial verdict. We defer to that conclusion, particularly where, as here, there is no evidence to the contrary. The Staffords have not demonstrated, beyond mere speculation, that the comment or the proceedings that followed affected Juror 10's ability to be impartial.[7] *See Cota*, 141 Ariz. at 10-11 (noting "sheer speculation" regarding the effect of purported jury misconduct cannot serve as grounds for a mistrial).

¶26 That the trial court could have chosen to designate Juror 10 as an alternate without disrupting the proceedings is of no consequence. The record does not show Juror 10 individually, or the jury generally, was biased because of Juror 10's misconduct. The court did not abuse its discretion in denying the Staffords' requests.

## III. Dr. Burns' Testimony

¶27 At trial, evidence was introduced that Jesse died of respiratory distress approximately thirty hours after he reportedly ingested the methadone that caused him to present to the emergency room on February 5, 2012. Dr. Burns testified she observed Jesse experience a mild respiratory depression characteristic of methadone ingestion while he was being treated in the emergency department and approved his discharge only after his respirations returned to the normal range. Dr. Burns testified

---

7 The Staffords cite *In re Hitchings*, 860 P.2d 466, 477 (Cal. 1993), for the proposition that violation of the juror admonition is "commonly regarded" as serious misconduct that raises a presumption of prejudice. However common it may be, this is not a correct statement of Arizona law. *See Perez v. Cmty. Hosp. of Chandler, Inc.*, 187 Ariz. 355, 360 (1997) (declining to adopt strict rule of presumed prejudice in cases involving *ex parte* communications with the jury); *see also Trostle*, 191 Ariz. at 12-13 (noting the party challenging a juror's inclusion on the panel bears the burden of proving "there is reasonable ground to believe that [the juror] cannot render a fair and impartial verdict") (quoting Ariz. R. Crim. P. 18.4(b), and citing *State v. Lavers*, 168 Ariz. 376, 390 (1991)).

she had never seen, either in her education or clinical experience, any data suggesting the respiratory effects occur as long as thirty hours after ingestion, and, if they did, "pretty much anyone who's taking methadone at all would have to stay in the hospital." Finally, Dr. Burns added:

> [T]he biggest concern with methadone is people who take an additional dose. . . . [Y]ou're at higher risk of having respiratory depressant [e]ffects when you take your second dose because you still have some in the body. So then you're basically adding, almost like you're stair-stepping on top of that. So that's the second dose is what is the most concerning.

¶28 The Staffords argue this testimony transformed Dr. Burns into "a second, undisclosed causation expert willing to opine that a purely hypothetical second dose of methadone at Jesse's home contributed to his death," and the trial court erred in denying their motion for new trial on this basis. *See* Ariz. R. Civ. P. 26(b)(4)(D) ("In all cases including medical malpractice cases each side shall presumptively be entitled to only one independent expert on an issue, except upon a showing of good cause."); Ariz. R. Civ. P. 26.1(a)(6) (requiring detailed disclosure regarding the qualifications and anticipated testimony of an expert witness). Whether Dr. Burns provided expert testimony in violation of Rules 26(b)(4)(D) or 26.1(a)(6) are questions of law, which we review *de novo*. *See State v. Salazar-Mercado*, 234 Ariz. 590, 592, ¶ 4 (2014) (citing *State v. Gutierrez*, 229 Ariz. 573, 576, ¶ 19 (2012)); *Solimeno v. Yonan*, 224 Ariz. 74, 77, ¶¶ 9-10 (App. 2010).

¶29 The Staffords acknowledge they were timely advised that Dr. Burns would provide expert testimony on the standard of care. The testimony identified above was appropriate for that purpose. It provided both an illustration of the extent of Dr. Burns' knowledge of the relevant area of medical practice and the basis for Dr. Burns' opinion that she did not violate the standard of care by discharging Jesse after he experienced the anticipated effects of methadone ingestion within the anticipated timeframe and his respirations returned to the normal range. Although Dr. Burns did express concern of "re-ingestion" after observing Jesse's condition and mannerisms in a video taken twelve hours after his discharge, she did not provide any opinion about what caused or contributed to his death, despite repeated questioning on the issue from the Staffords' counsel.

¶30        Dr. Burns did not testify as a causation expert and was not required to make any additional disclosures; nor did she violate the one-expert-per-issue presumption articulated in Rule 26(b)(4)(D). We find no error.

## IV.    Expert Testimony Regarding Post Mortem Gastric Methadone Levels

¶31        Before trial, the Staffords moved to preclude any expert testimony extrapolating the timing of Jesse's last methadone ingestion from his post mortem gastric methadone levels, arguing the method was not scientifically valid because of the way the drug redistributes in the body after death. Counsel for Dr. Burns explained that the conclusion that Jesse re-ingested methadone was based upon the significant amount of methadone in his stomach, the rate the stomach empties, and the time that passed between his discharge and death. The trial court denied the motion and related request for evidentiary hearing after concluding the dispute was simply a "difference of opinion" between the experts.

¶32        On appeal, the Staffords argue that admitting any testimony based upon this "junk science" was error without holding a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to determine its reliability. We review the necessity of a hearing to resolve a dispute in the admissibility of expert testimony for an abuse of discretion. *See Ariz. State Hosp./Ariz. Cmty. Prot. & Treatment Ctr. v. Klein*, 231 Ariz. 467, 474, ¶¶ 31-32 (App. 2013) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

¶33        Although the trial court may hold an evidentiary hearing to evaluate proposed expert testimony, it is not required to do so. *See id.* Here, both parties presented lengthy and detailed pleadings, cited supporting medical literature, and attached affidavits containing the specific opinions of their other disclosed medical and pharmacological experts. There is no indication the court required additional information to make a decision on the reliability of the methodology, and the Staffords do not articulate otherwise in their briefs. We find no abuse of discretion.

## V.    Cocaine Metabolite

¶34        The Staffords also argue the trial court erred by allowing the jury to hear evidence that a postmortem urine sample contained cocaine metabolites because the evidence was unfairly prejudicial. Because the trial court is in the best position to balance the probative value of challenged evidence against the danger of unfair prejudice, we review for an abuse of

discretion and will affirm absent a clear abuse of discretion or legal error and prejudice. *See State v. Salamanca*, 233 Ariz. 292, 296, ¶ 17 (App. 2013) (quoting *State v. Connor*, 215 Ariz. 553, 564, ¶ 39 (App. 2007)); *Gasiorowski v. Hose*, 182 Ariz. 376, 382 (App. 1994) (citing *Selby v. Savard*, 134 Ariz. 222, 227 (1982)); *see also* Ariz. R. Evid. 403.

**¶35** The trial court originally granted the Staffords' motion *in limine* precluding reference to the cocaine metabolite, agreeing the presence of cocaine was irrelevant in the absence of some evidence that the cocaine contributed to Jesse's death. But after the court considered the Staffords' evidence attempting to portray Jesse as a person who would not or could not have re-ingested methadone after being discharged from the emergency department, "giving the jury a pretty sanitized view of Jesse," the court reconsidered its ruling, explaining:

> There's been testimony that Ms. Stafford searched the house for drugs before, that, you know, so far the alcohol bottles that we saw [in Jesse's room] were decorative items. What this evidence would tend to show is that Jesse had been — had been using drugs for some period of time and his parents didn't know, that he knew where to get drugs, that he knew how to hide his use from his parents. All of those are legitimate items for the jury to consider in determining whether his death was caused by the methadone taken before the hospital or whether he may have had access and used methadone afterwards. . . . [T]he 403 balancing is a lot different now that we've had two days of testimony than it was before trial. And after listening to the testimony that's been presented so far, I think the permissible uses under 404 B of this evidence, that is to show . . . that Jesse knew where to get drugs, that he knew how to hide drugs and hide drug use from his parents. And those issues, I think, are directly relevant to what the jury has to decide and they are permissible under Rule 404 B.

The court limited the admissibility of the cocaine metabolite evidence to those purposes and permitted the Staffords to recall their toxicologist to address the issue on rebuttal. After the Staffords moved for reconsideration, stressing the prejudicial nature of evidence of illegal drug use, the court affirmed its ruling, reiterating that "after listening to the two and a half days of testimony, the balancing has shifted considerably."

¶36    We find no abuse of discretion.  The evidence was relevant to rebut the testimony of the Staffords' witnesses that Jesse did not, could not, or would not have sought out additional methadone after his discharge from the emergency department.  And although evidence of drug use may be prejudicial, the danger of prejudice was not so obviously unfair here, where it is undisputed that Jesse had previously ingested methadone illegally.

## VI.    Use of Dr. Burns' Video Deposition

¶37    The Staffords argue the trial court erred by refusing to let them play excerpts from Dr. Burns' video deposition "when and how the [Staffords] wanted to play them."  They do not elaborate on when or how excerpts from Dr. Burns' video deposition were used, when or how the Staffords wished to use the video, how the court interfered with the Staffords' presentation, or how the court's restrictions affected the verdict. *See* ARCAP 13(a)(7)(A) (requiring an opening brief to contain "contentions concerning each issue presented for review, with supporting reasons for each contention . . . and appropriate references to the portions of the record on which the appellant relies").  Because the Staffords failed to develop this argument in a meaningful way, it is waived, and we do not address it.  *See Polanco v. Indus. Comm'n*, 214 Ariz. 489, 491 n.2, ¶ 6 (App. 2007) (noting a party waives an issue on appeal when he fails to develop and support his argument) (citations omitted).

## VII.    Judgment as a Matter of Law

¶38    The Staffords argue the trial court erred in denying their motions for judgment as a matter of law that: (1) the immediate cause of Jesse's death was methadone intoxication, (2) the mechanism of death was respiratory failure, and (3) the manner of death was accidental.  Whether a trial court should have granted judgment as a matter of law presents a question of law, which we review *de novo*.  *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cty.*, 222 Ariz. 515, 524, ¶ 14 (App. 2009) (citing *Aegis of Ariz., L.L.C. v. Town of Marana*, 206 Ariz. 557, 566, ¶ 34 (App. 2003)).  We also review *de novo* the interpretation and application of the Arizona Rules of Civil Procedure.  *See Duckstein v. Wolf*, 230 Ariz. 227, 231, ¶ 8 (App. 2012) (citing *Vega v. Sullivan*, 199 Ariz. 504, 507, ¶ 8 (App. 2001)).

¶39    Arizona Rule of Civil Procedure 50(a)(1) states:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court

may determine the issue against the party and may grant a
motion for judgment as a matter of law against that party with
respect to a claim or defense that cannot under the controlling
law be maintained or defeated without a favorable finding on
that issue.

By its plain language, Rule 50 allows the trial court to enter judgment "with
respect to a claim or defense." *See also Salica v. Tucson Heart Hosp.-
Carondelet, L.L.C.*, 224 Ariz. 414, 417, ¶ 11 (App. 2010) (holding judgment as
a matter of law appropriate where "the facts produced in support of *the
claim or defense* have so little probative value, given the quantum of evidence
required, that reasonable people could not agree with the conclusion
advanced by the proponent of *the claim or defense*") (emphasis added)
(quoting *A Tumbling-T Ranches*, 222 Ariz. at 524, ¶ 14).

**¶40**         Here, the Staffords did not request judgment on their claims
for medical malpractice or wrongful death; they simply asked the trial court
to remove from the jury, and instead resolve as a matter of law, particular
factual issues regarding the cause, mechanism, and manner of Jesse's death.
Although seemingly undisputed, a substantive decision on these issues
would not resolve the Staffords' claims that Dr. Burns was negligent, nor
quash Dr. Burns' defense that Jesse's death resulted from the re-ingestion
of methadone after discharge.  Judgment as a matter of law is not available
to dispose of issues of fact that do not defeat a claim or defense, and the
court did not err in denying the Staffords' motions.

## VIII.   Rule 68 Sanctions

**¶41**         Finally, the Staffords argue the trial court erred in imposing
sanctions pursuant to Arizona Rule of Civil Procedure 68(g) because the
$10,000 offer of judgment was invalid, as it was not made in good faith.  We
review the interpretation and application of the offer of judgment rule *de
novo. Berry v. 352 E. Va., L.L.C.*, 228 Ariz. 9, 15, ¶ 31 (App. 2011) (citing *Levy
v. Alfaro*, 215 Ariz. 443, 444, ¶ 6 (App. 2007)).  We review the trial court's
decision to impose Rule 68 sanctions for an abuse of discretion.  *Id.* (citing
*Hmielewski v. Maricopa Cty.*, 192 Ariz. 1, 4, ¶ 13 (App. 1997)).

**¶42**         A party may make an offer "to allow judgment to be entered"
in a civil case "any time more than 30 days before the trial begins."  Ariz. R.
Civ. P. 68(a).  Rule 68(g) states:

> If the offeree rejects an offer and does not later obtain a more
> favorable judgment other than pursuant to this Rule, the
> offeree must pay, as a sanction, reasonable expert witness fees

and double the taxable costs, as defined in A.R.S. § 12-332, incurred by the offeror after making the offer and prejudgment interest on unliquidated claims to accrue from the date of the offer.

The Staffords argue an offer of judgment must be "at least arguably reasonable . . . compared with a lawsuit's probable damages" to warrant imposition of sanctions under Rule 68, and to hold otherwise impermissibly allows the offeror to benefit from a "no-risk offer." We disagree.

¶43 The Staffords rely on a Seventh Circuit Court of Appeals decision, *August v. Delta Airlines, Inc.*, 600 F.2d 699 (7th Cir. 1979), to support their position. This case is not persuasive for several reasons. First, the holding in *August*, allowing the trial court to exercise discretion whether to allow a defendant to recover costs under Federal Rule 68, was specifically limited to cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-17. *See August*, 600 F.2d at 700, 702 ("[W]e believe that a liberal, not a technical, reading of Rule 68 is justified, at least in a Title VII case. We need not decide whether this same approach should be taken in other kinds of cases."). In reaching its conclusion, the Seventh Circuit Court of Appeals contraposed the plain language of the rule and the federal policy of encouraging aggrieved individuals to seek redress for violations of their civil rights, ultimately deciding "not . . . to permit a technical interpretation of a procedural rule to chill the pursuit of that high objective." *Id.* at 701. No similar overarching goal is at issue in this tort action. Additionally, Federal Rule of Civil Procedure 68 is materially different than the Arizona correlate because it does not authorize an award of costs where judgment is entered in favor of the defendant, as occurred in the immediate case. *See* Fed. R. Civ. P. 68(a) (authorizing only "a party defending against a claim" to make an offer of judgment), (d) (requiring the offeree to pay costs only if he obtains a less favorable judgment than the defending party's unaccepted offer); *Goldberg v. Pac. Indem. Co.*, 627 F.3d 752, 756-57 (9th Cir. 2010) (noting Federal Rule 68 does not allow recovery where judgment is entered in favor of the defendant).

¶44 Moreover, Arizona courts have uniformly held, consistent with the rule's plain language, that sanctions imposed by Rule 68(g) are both mandatory and punitive. *See* Ariz. R. Civ. P. 68(g) (stating "the offeree *must* pay, as a *sanction*, reasonable expert witness fees and double the taxable costs") (emphasis added); *Arellano v. Primerica Life Ins.*, 235 Ariz. 371, 381, ¶ 48 (App. 2014); *Levy*, 215 Ariz. at 445, ¶ 8; *Davis v. Disc. Tire Co.*, 182 Ariz. 571, 573-74 (App. 1995). We are reluctant to stray from this plain language. *See Robertson v. Alling*, 237 Ariz. 345, 347, ¶ 10 (2015) ("When a

rule's language is unambiguous, we apply it as written.") (citing *Salazar-Mercado*, 234 Ariz. at 592, ¶ 4). The Staffords urge us to do so as a matter of public policy. However, we find the policy behind Rule 68(g) — to promote settlement and avoid protracted, unnecessary litigation, *see, e.g.*, *Warner v. Sw. Desert Images, L.L.C.*, 218 Ariz. 121, 138, ¶ 57 (App. 2008) (citing *Wersch v. Radnor/Landgrant-A Phx. P'ship*, 192 Ariz. 99, 102 (App. 1997)) — will not be served by judicially grafting additional requirements onto the offer. A reasonableness requirement would only increase the cost of litigation by inviting the expenditure of time to resolve an offer's validity, driving the parties' settlement positions further apart. *See Brown v. Valley Nat'l Bank of Ariz.*, 26 Ariz. App. 538, 540-41 (1976) ("Public policy is better served by encouraging settlements in proper cases rather than to encourage continuing litigation in the courts.") (quoting *Broadway Plan v. Ravenstein*, 364 S.W.2d 741, 744 (Tex. Civ. App. 1963)).

**¶45** Ultimately, it is solely within the purview of the parties to prudently evaluate their causes of action and defenses and the potential risks and benefits of proceeding to trial. If the defendant/offeror underestimates his exposure and the plaintiff/offeree obtains a more favorable judgment — even by a single dollar — the offeror stands liable for costs and expert witness fees. Likewise, if the plaintiff/offeror exaggerates his likelihood of success by presenting an offer the other party perceives as too high, the defendant/offeree need only work to obtain an award of damages against him that is less than the offer — again, by a single dollar. The offeror should not be punished for investing in the necessary calculation to determine, correctly, the existence and extent of his financial exposure at trial. Nor should the offeree benefit from his failure to properly value a case or be permitted, after the verdict is returned, to argue either what was "reasonable" so as to justify his refusal to accept the offer or, alternatively, to make some belated and collateral assertion of what the jury should have awarded.

**¶46** Accordingly, we decline to impose a requirement that offers of judgment be deemed reasonable before sanctions are imposed under Rule 68(g). That other jurisdictions have held otherwise does not vitiate Arizona's interest in encouraging settlement, nor change our analysis.

## CONCLUSION

¶47  For the foregoing reasons, we accept jurisdiction and deny relief.



AMY M. WOOD • Clerk of the Court
FILED: AA