NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ZAMBEZI HOLDINGS, LLC, an Arizona limited liability company; and MARK LOVE, an individual, *Plaintiffs/Counterdefendant/Appellants/Cross-Appellees*,

*v.*

PROFORMA HEALTH, PLLC, an Arizona professional limited liability company; MUNDERLOH HOLDINGS, LLC, an Arizona limited liability company; MUNDERLOH MEDICAL, INC., an Arizona corporation; and TIMOTHY MUNDERLOH, an individual, *Defendants/Counterclaimants/Appellees/Cross-Appellants*.

No. 1 CA-CV 21-0406
FILED 8-4-2022

Appeal from the Superior Court in Coconino County
No. S0300CV201400492
The Honorable Cathleen Brown Nichols, Judge

**AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART
AND REMANDED**

COUNSEL

Mangum Wall Stoops & Warden, PLLC, Flagstaff
By Brandon J. Kavanagh
*Counsel for Plaintiffs/Counterdefendant/Appellants/Cross-Appellees*

Aspey, Watkins & Diesel, PLLC, Flagstaff
By Whitney Cunningham
*Counsel for Defendants/Counterclaimants/Appellees/Cross-Appellants*

---

**MEMORANDUM DECISION**

Presiding Judge Cynthia J. Bailey delivered the decision of the Court, in which Judge D. Steven Williams and Chief Judge Kent E. Cattani joined.

---

**B A I L E Y**, Judge:

¶1 This appeal and cross-appeal involve two brothers-in-law—Mark Love ("Mark"), an entrepreneur, and Timothy Munderloh ("Tim"), a chiropractor—and the entities they use to own and operate their businesses. Mark, Tim, and Siobhan Love Munderloh ("Siobahn")—who is Tim's wife and Mark's sister—worked cooperatively for approximately a decade operating Munderloh Chiropractic, LLC ("Munderloh Chiropractic") and later a Massage Envy franchise in Flagstaff. In 2013, Mark opened a Massage Envy franchise in Prescott, and shortly thereafter, Tim cut Mark and his company, Zambezi Holdings, LLC ("Zambezi") (collectively, "Mark") off from twice-monthly cash distributions from Proforma Health PLLC ("Proforma"), the holding company formed to do business as Munderloh Chiropractic. Mark sued Proforma; Munderloh Chiropractic, replaced by Munderloh Medical, Inc. ("MMI"); Munderloh Holdings, LLC ("Munderloh Holdings"); and Tim (collectively, "Tim") alleging breach of contract and seeking judicial dissolution of Proforma. Tim then sued Mark alleging, among other things, the taking of a corporate opportunity because Mark had opened the Prescott Massage Envy without Tim.

¶2 Mark now appeals the superior court's judgments in favor of Tim, raising several issues, including the court's judgment as a matter of law in favor of Tim regarding liability on the corporate opportunity claim. Tim cross-appeals the jury's verdict in favor of Mark on Mark's claim for breach of contract and the superior court's denial of Tim's motion for a new trial. For the following reasons, we reverse as to the appeal on the corporate opportunity claim, affirm as to the cross-appeal, vacate the award of attorneys' fees and costs and the separate judgment on 2018 jury fees, and remand for the court to reconsider attorneys' fees, costs, and jury fees.

## FACTS AND PROCEDURAL HISTORY

¶3 After Tim resigned from his job working for a local chiropractic office in Flagstaff, Mark and Tim formed their own chiropractic business. Munderloh Chiropractic began business in April 2004, using the

tax ID of Retail Automation, a company previously created by Mark. Tim received 75 percent ownership of Munderloh Chiropractic, and Mark received 25 percent. Munderloh Chiropractic operated from 2004 to 2012 under the umbrella of Retail Automation.

¶4          In 2012, Proforma was formed to do business as Munderloh Chiropractic. At the same time Proforma was created, Munderloh Holdings and Zambezi were created. Proforma is owned 75 percent by Munderloh Holdings, Tim's holding company that acts as the manager of Proforma, and 25 percent by Zambezi, Mark's solely owned holding company. After the formation of Proforma, Mark and Tim began receiving distributions twice a month from Proforma.

¶5          Meanwhile, in 2007, Mark and Tim, with help from Siobahn, sought to open a Massage Envy franchise in Flagstaff, and they formed a new holding company, Timark, Inc. ("Timark"), to operate and hold the Flagstaff franchise. Timark d/b/a Massage Envy Spa Flagstaff was incorporated in April 2007, with Mark and Tim each receiving a 50 percent ownership interest and both being directors.[1] At about the same time, the Flagstaff Massage Envy franchise was awarded to Mark and Tim, and it was purchased using funds from Mark and Siobahn and through a Small Business Administration loan. The business opened in November 2007.

¶6          Mark, Tim, and Siobhan were in constant communication and met once a week at the Munderloh Chiropractic office to "discuss anything that was going on" related to their Flagstaff businesses. Mark and Tim did not regularly hold corporate meetings or memorialize their conversations in formal minutes, however, because they talked all the time about business in their adjacent offices at Munderloh Chiropractic and around the dinner table.

¶7          In late 2011 and early 2012, their discussions included whether to invest in a second Massage Envy franchise in Prescott, approximately 100 miles from Flagstaff. After the Flagstaff Massage Envy had opened, Steve Cook, a regional developer who had worked as their go-between with the Massage Envy corporate office, broached the possibility of opening a franchise in Prescott, but after discussing it, Mark and Tim did not believe the time was right to undertake a new venture.

---

[1]      This 50/50 ownership split apparently occurred with no negotiation between Mark and Tim, who testified he was unaware of any "formal meeting minutes," given that it was "a family business."

**¶8**　　　　In 2011, Cook called again and told them they needed to start thinking about whether they were interested in opening a new franchise in Prescott. Cook notified them that someone else, possibly Cook himself, was interested in that location.

**¶9**　　　　Mark, Tim, and Siobahn discussed the Prescott opportunity off-and-on for several months. From the beginning, Mark and Tim were at a stalemate, largely because Mark proposed that he have a 75 percent ownership interest in the Prescott Massage Envy and Tim have a 25 percent interest; Tim, however, proposed that each have a 50 percent interest. Tim also continuously questioned whether "the whole opportunity was too risky." By early 2012, Mark believed prompt action was necessary because Massage Envy franchise royalties were set to increase by two percent after the first of April 2012, thus increasing the cost to new franchisees over the ten-year life of a franchise by approximately $300,000, a fact that Mark discussed with Tim.

**¶10**　　　　On March 21, 2012, Mark, Tim, and Siobahn held a weekly meeting, and the main topic discussed was the Prescott Massage Envy. Mark prepared "Meeting Notes" for the meeting, which expressed that Mark planned to go ahead with the Prescott Massage Envy, the need for Tim to make a quick decision, and the need for better communication between the parties:

> Prescott is going to move forward pretty quickly. It has been difficult without feedback and without an answer and I am assuming that you have withdrawn from this project. I want you as part of this project[,] but I don't want to push you uphill on this or others. I don't want to fight with family or set us up for failure later on, any more than now. I am very w[]ary of further business ventures that could erode the family further. I would like to have Siobhan communicate with me more. I think this has been hampered more due to kitchen round table discussions than having meetings with the other partner. Siblings are fiercely independent. We are going to have to find a way to communicate and take direction better and meetings is a great new step. . . .

(Bullet points omitted.)

**¶11**　　　　At the meeting, Mark told Tim that he would not agree to a 50/50 ownership split given the enormous time commitment Mark would personally and almost exclusively be making on the project. Mark

4

explained that he would have to spend two full summers in Prescott away from his family, and that he saw no reason why he should not receive 75 percent of the Prescott franchise ownership, especially given that Tim already had 75 percent ownership in the parties' chiropractic business. Tim refused to negotiate any ownership percentage other than 50/50, then informed Mark that he "didn't want any part of it" and never again brought up the subject of the Prescott franchise, despite Mark stating that he would be proceeding with the project on his own.

¶12        Mark discussed the Prescott Massage Envy franchise opportunity with Cook, who subsequently recalled that Mark was "distraught" at the idea of going it alone but didn't want to lose the opportunity. Cook affirmed that Mark "could swing it on his own" but decided to confirm Mark's claim that Tim did not "want any part of it." Cook met with Tim and Siobahn, who confirmed that they had declined Mark's offer of joint ownership of the proposed Prescott Massage Envy because "they didn't think Prescott was ready." They wanted to "let Flagstaff mature a little bit more," and they were unwilling to go forward within anything in Prescott unless it was a "50/50 situation." They also expressed anger that Cook would recommend that the Massage Envy corporate office offer the opportunity to Mark alone, but Cook saw no problem with such an offer:[2]

> But I -- I said, well, there's -- there's no, you know, rules against that. And because you're partners on one doesn't mean you have to be partners on another and that he meets the -- you know, the requirements and he says that he's got the -- you know, the financial wherewithal to do it. And he proved that . . . .

¶13        With Cook's endorsement, Mark applied for the Prescott Massage Envy franchise and was awarded it in the summer of 2012.[3] The Prescott Massage Envy opened for business in May 2013.

---

[2]      Cook's recommendation was a necessary step in the process of being awarded a Massage Envy franchise. The final decision to grant or deny a franchise application rested with the Massage Envy corporate office following a financial vetting.

[3]      Mark financed the purchase and development of the Prescott Massage Envy franchise in part using his own funds and in part by

**¶14** Shortly thereafter, in July 2013, Proforma stopped issuing distributions to Zambezi (Mark). Mark filed a complaint in September 2014 for breach of contract and judicial dissolution against Proforma, Munderloh Holdings, and Tim, seeking reimbursement for the bi-monthly distributions that Mark asserted Zambezi was to receive from Proforma. Mark alleged that he and Tim had verbally agreed to take $3,000 bi-monthly distributions from Proforma, divided according to each partner's ownership percentage, with Tim receiving 75 percent ($2,250.00) and Mark receiving 25 percent ($750.00) from each distribution. Mark alleged the partners had followed the agreement for more than a year, but in July 2013, Tim made a unilateral decision to stop issuing distributions to Zambezi, although he continued to issue and in fact increased distributions to himself.

**¶15** Tim filed an answer and third-party complaint against Mark.[4] The initial third-party complaint did not mention the corporate opportunity doctrine, but in February 2015, Tim filed a first amended third-party complaint asserting that Mark breached a fiduciary duty "by not bringing business opportunities to the corporation or, alternatively, to the partnership."[5] Mark denied there were any business opportunities he did not bring to Tim and Timark for consideration, and he asserted numerous affirmative defenses.

**¶16** In 2016, Tim incorporated MMI, which operates out of the Proforma/Munderloh Chiropractic office. Tim began providing

---

borrowing from his mother after an investor died suddenly. Mark worked "60 hours plus" a week on the Prescott business before its opening and during its first year of operation. At no time through at least 2014 did Tim or Siobhan approach Mark regarding involvement in that enterprise.

[4] Tim alleged conversion, breach of contract, and breach of the implied covenant of good faith and fair dealing based on his claim that Mark had converted Munderloh Chiropractic's website and taken over its emails, website, Facebook page, financial accounts, and some tax documents.

[5] Tim added this allegation after Mark terminated Siobhan's employment as the Clinic Administrator of the Flagstaff Massage Envy on January 30, 2015. Within an hour of that termination, Tim transferred $50,000 from the bank account belonging to Timark into an account held by Munderloh Holdings. This resulted in a separate judgment in favor of Mark that is not at issue here.

chiropractic services on behalf of MMI and billing for these services through MMI.

¶17        Before trial, Mark moved for summary judgment on Tim's breach of fiduciary duty claim, arguing in part that (1) the Prescott Massage Envy franchise was not a corporate opportunity and Mark had no duty to present the opportunity to Tim; (2) if any obligation existed, Mark had satisfied the obligation; and (3) any corporate opportunity claim was barred by the statute of limitations and/or laches.  *See* Ariz. R. Civ. P. 56.  Tim cross-moved for summary judgment, asserting that Mark violated a duty to present the Prescott Massage Envy opportunity to Tim and Timark on the same terms as the parties' Flagstaff Massage Envy agreement.  The court denied both motions.

¶18        Trial to a jury began in May 2018, but the court declared a mistrial after learning that three jurors had extra pages in their notebooks, and at least one juror had received pages in an exhibit that he or she should not have received, the contents of which had been read to the other jurors.

¶19        At the conclusion of a new trial in October 2019, both Mark and Tim moved for judgment as a matter of law on various claims, including the corporate opportunity claim, the defenses of laches and limitations, and damages.[6]  *See* Ariz. R. Civ. P. 50(a).  The court granted Tim's motion for judgment as a matter of law on the corporate opportunity claim, but determined the issue of damages should be submitted to the jury after concluding corporate formalities had not been met:

> [T]here wasn't a corporate meeting where they agreed to consider the opportunity and take a vote on it.  So based on the evidence that was presented, this was not an opportunity that was presented to Timark in a corporate meeting where the two individuals, Mr. Love and Dr. Munderloh, could then, as part of the -- officers of Timark -- take a vote and decide if the corporation itself was going to take advantage of this opportunity.

¶20        Based on this ruling, and over Mark's objections, the court instructed the jury that Mark was liable to Tim for taking a corporate opportunity and that the jury must decide damages as to that claim.  The

---

[6]        The court granted judgment as a matter of law on several claims, including Mark's claims against MMI for conversion (Count 11) and unjust enrichment (Count 12).

jury found damages of $390,000 in favor of Tim and against Mark on the corporate opportunity claim. The jury also found damages in favor of Mark and against Tim on Mark's claims for breach of contract ($111,000) and breach of fiduciary duty ($13,000).

**¶21** Tim moved for a new trial, challenging the award of $111,000 to Mark. *See* Ariz. R. Civ. P. 59(a)(1). The superior court denied the motion.

**¶22** In May 2021, the court entered a judgment under Arizona Rule of Civil Procedure ("Rule") 54(b) in favor of Mark for $111,000 and in favor of Tim for $377,000, plus attorneys' fees to MMI ($131,809) and costs to Tim and MMI ($14,470.30). That same day, the court entered a separate judgment for jury fees, providing in part that each side pay 50 percent of the 2018 trial's jury fees ($2,841.34 each) and Mark pay 100 percent of the 2019 trial's jury fees ($3,864.09).

**¶23** Mark filed a timely notice of appeal from these portions of the judgment under Rule 54(b) and the judgment for jury fees. Tim timely cross-appealed. We have jurisdiction over this appeal and cross-appeal pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") sections 12-2101(A)(1) and 12–2102(B); *see also* A.R.S. § 12-2101(A)(5)(a).

## DISCUSSION

### I.     *JMOL on the Corporate Opportunity Claim*

**¶24** Mark argues that the superior court erred in granting judgment as a matter of law in favor of Tim on the corporate opportunity claim.

**¶25** We review *de novo* whether the superior court should have granted judgment as a matter of law. *Stafford v. Burns*, 241 Ariz. 474, 483, ¶ 35 (App. 2017). In ruling on a motion for judgment as a matter of law, we view the facts in the light most favorable to the party opposing the motion. *Crackel v. Allstate Ins. Co.*, 208 Ariz. 252, 259, ¶ 20 (App. 2004). The standards for judgment as a matter of law and for summary judgment are the same, and they apply to both claims and defenses. *See Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990). "Either motion should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Id.*

¶26            Rooted in equity, the corporate opportunity principle is a species of the fiduciary duty of loyalty and disclosure.  *See AMERCO v. Shoen*, 184 Ariz. 150, 158-59 (App. 1995); *Alger v. Brighter Days Mining Corp.*, 63 Ariz. 135, 142-44 (1945).  "Arizona courts have adopted a somewhat narrow view of the corporate opportunity doctrine," *Taser Int'l, Inc. v. Ward*, 224 Ariz. 389, 398, ¶ 33 n.20 (App. 2010), which generally "prohibits fiduciary usurpation of a corporate opportunity," *AMERCO*, 184 Ariz. at 158.  The "precise test is whether the director has a specific duty to act in regard to the particular matter as a representative of the company.  If there is no such duty, the director may acquire outside interests although the corporation may be more or less interested."  *Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 122 (1966) (citations omitted); *see also Zeckendorf v. Steinfeld*, 12 Ariz. 245, 261-62 (1909), *modified by* 225 U.S. 445 (1912) (holding that, for a duty to exist, a corporation must have "an interest, actual or in expectancy, in the property" or show an officer or director's actions "hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created" (citation omitted)).

¶27            The opportunity must actually exist and not merely be a concept "briefly discussed or abstractly contemplated."  *Taser*, 224 Ariz. at 399, ¶ 36.  The doctrine does not extend to all possible business ideas discussed or learned about because "such [an] extension would have the effect of unnecessarily restraining competition" and could effectively create a "de facto non-compete agreement."  *Id.*  Further, a corporate opportunity does not exist if it is not available to the corporation.  *See Zeckendorf*, 12 Ariz. at 262-63 (concluding there was no lost opportunity when the corporation lacked resources to purchase the disputed property).

¶28            The record dictates the conclusion that the superior court should have granted judgment as a matter of law in favor of Mark rather than Tim because, despite Mark and Tim discussing purchasing the Prescott Massage Envy franchise, no corporate opportunity actually existed for Timark or Tim.  Timark is not a party to this litigation, and even if it was, the scope of Timark's business is clearly limited to operating the Flagstaff Massage Envy.  Timark's Articles of Incorporation list only a Flagstaff address and location, and Timark's Massage Envy Franchise Agreement is for Flagstaff, Arizona only, and reserves to the Massage Envy corporate office alone the sole right to establish other Massage Envy

franchises "at any locations other than within the Territory."[7]  Additionally, both Mark and Tim regarded a potential Prescott Massage Envy franchise as an entity separate and distinct from Timark, one that would be "siloed" under a separate holding company rather than operate as a subsidiary of Timark.  Further, even if Timark desired to engage in a more expansive mission than operating the single Flagstaff Massage Envy, Timark could not simply preempt for itself all possible fields and territories into which it might venture.  *See Dishman v. Umberhour*, 241 S.W. 62, 63-64 (Ky. 1922); *Solimine v. Hollander*, 16 A.2d 203, 218-19 (N.J. Ch. 1940); *Szymanowski v. Brace*, 987 A.2d 717, 726, ¶ 27 (Pa. Super. Ct. 2009).  In securing the right to the Prescott Massage Envy, Mark acquired a separate and distinct entity in another community, and his acquisition of the Prescott franchise did not "hinder or defeat the plans and purposes of [Timark] in carrying on or developing its legitimate and usual business."  *Tovrea*, 100 Ariz. at 123.

**¶29**        Moreover, even assuming that, as Mark's partner and 50 percent owner in Timark, Tim personally had an expectancy interest in a corporate opportunity,[8] the undisputed facts make clear the superior court should have granted judgment as a matter of law in Mark's favor because the Prescott franchise was never a corporate opportunity belonging to Tim.  A franchise award could only occur with both Cook's recommendation and approval by the Massage Envy corporate office.  However, neither Cook nor the Massage Envy corporate office was interested in granting the franchise to Tim.  Cook testified that, without Mark, Tim would not be separately approved as a franchisee because (1) Tim's chiropractic business conflicted in part with Massage Envy's business—a conflict that would not be overlooked without Mark's inclusion—and (2) Tim could not devote full-time efforts to the Prescott Massage Envy.  *See generally* 3 Fletcher Cyc. Corp. ("Fletcher") § 862.10 (2021) (stating that a corporation can have no expectancy in an opportunity if the offering "party refuses to deal with it"); *New v. New*, 306 P.2d 987, 996-97 (Cal. Dist. Ct. App. 1957) ("[T]he power to negate the enjoyment of a business opportunity by a third party, a stranger, does not constitute the kind of an expectancy which lies at the basis of the corporate opportunity doctrine.").  Thus, although Mark could operate the Prescott Massage Envy without Tim, Tim could not do so without Mark, and Mark had no duty to act regarding that franchise, both because he had no role or influence in the Massage Envy corporate office's decision

---

[7]        The Massage Envy Flagstaff-West Business Plan analyzed the franchise's economic potential "within a 5-mile radius of the Woodlands Village Complex" in Flagstaff.

[8]        *See generally Funk v. Spalding*, 74 Ariz. 219, 223-24 (1952).

concerning the awarding of franchises and because nothing would have required Mark to help Tim finance and run the Prescott franchise even had it been an opportunity available to Tim. *See* Fletcher § 862.10 ("A director is not required to use his or her own money or credit to finance the business of the company.").

¶30         Finally, as we have noted, the corporate opportunity doctrine is rooted in equity. Tim was offered 25 percent ownership of the Prescott Massage Envy as an essentially passive owner but declined the opportunity—both because he was not offered a 50/50 ownership option and because Tim believed they were not ready to take on a new venture. In essence, Tim expected Mark to both "improve" his offer and wait for some undetermined time, all while risking the loss of the opportunity. Mark was not required to do so. In general, one can have no expectancy in an opportunity if one has previously rejected the opportunity, *see id.*, and Tim's decision to let Mark take all the risk, wait for almost three years after declining Mark's offer and twenty-one months after the Prescott Massage Envy opened, then claim usurpation of a corporate opportunity stretches the bounds of equity. *See Turner v. Am. Metal Co.*, 50 N.Y.S.2d 800, 814 (N.Y. App. Div. 1944) ("There are persons, who will stand by; see the expenditure incurred; if it turns out profitable, set up their claim; if otherwise have nothing to do with it. There is no tangible expectancy in a gamble." (citation and internal quotation marks omitted)). We will not transform the corporate opportunity doctrine into a mechanism for the judicial creation of contracts when parties cannot agree on material terms and conditions. *See Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 473-74 (1966).

¶31         On this record, the superior court should have granted judgment as a matter of law in favor of Mark because no corporate opportunity existed for Timark or Tim. Accordingly, we reverse the judgment in favor of Tim and against Mark on the corporate opportunity claim.[9]

---

[9]     Because no corporate opportunity claim existed, we do not address Mark's arguments that the superior court erred in (1) concluding the corporate opportunity principle was breached as a matter of law because corporate formalities were not observed; (2) failing to apply the statute of limitations and/or laches to preclude Tim's corporate opportunity claim; and (3) the award of damages (by allowing Tim personally to recover damages and in finding sufficient the evidence supporting the calculation of damages).

## II.    The Award of Attorneys' Fees and Taxable Costs

¶32    Mark argues the superior court erred in its award of attorneys' fees and costs.  Tim argues that because MMI was the only entity awarded fees in the court's Rule 54(b) judgment, and the claims against MMI were dismissed, the award of fees may stand.  The record supports Mark's argument.

¶33    We review for an abuse of discretion the superior court's ruling on a request for attorneys' fees, but review *de novo* issues of law, including whether the court relied on an incorrect legal standard.  *Charles I. Friedman, P.C. v. Microsoft Corp.*, 213 Ariz. 344, 350, ¶ 17 (App. 2006); *In re Marriage of Pownall*, 197 Ariz. 577, 580, 583, ¶¶ 7, 26 (App. 2000).

¶34    In its order awarding fees, the court applied the "net judgment" test and determined that Tim—or more specifically, the group of defendants we refer to in this decision collectively as Tim—was the "net winner."  The court's analysis included the following reasoning:

> [T]he Plaintiffs obtained verdicts for $111,000.00 on Count 1, breach of contract, and $13,000.00 on Count 5, breach of fiduciary duty, in their Second Amended Complaint.  Defendants obtained directed verdicts on Count 9, breach of contract, and Count 10, breach of covenant of good faith and fair dealing, in Plaintiffs' Second Amended Complaint, and a verdict for $390,000.00 on their claim for breach of fiduciary duty for taken corporate opportunity in Defendants' Fourth Amended Third Party Complaint/Counterclaim.  Therefore, Defendants were the "net winners" and, as such, the successful parties in this case.

¶35    Relying on that analysis, the court determined that Defendants were the "successful party" under A.R.S. § 12-341.01, which allows a court to award attorneys' fees "[i]n any contested action arising out of a contract, express or implied."  Thus, the court granted Tim's request for attorneys' fees and costs and denied Mark's request:

> **IT IS HEREBY ORDERED**, for the foregoing reasons, granting Defendants' Motion for Award of Attorneys' Fees and Taxable Costs, since they were the net winners, and, as such, the successful parties, and awarding Defendants $131,809.00 in attorneys' fees and $14,470.30 in taxable costs.

**IT IS FURTHER ORDERED**, based on the reasons stated above, denying the Plaintiffs' Application for Award of Attorneys' Fees and Costs since they were not the net winners/successful parties in this case.

The court then issued its Rule 54(b) judgment awarding attorneys' fees to MMI and costs to MMI and Tim personally.

**¶36** The court's judgment conflated MMI with the entire group of defendants, a blending that has no reasonable basis in fact. In addition, although the superior court has discretion to determine who is the successful party in cases where there are multiple parties and claims, *Schwartz v. Farmers Ins. Co. of Ariz.*, 166 Ariz. 33, 38 (App. 1990), the court's net winner reasoning in this case conflated Mark's successful contract action, which provided a basis for a claim of attorneys' fees under § 12-341.01, with Tim's successful tort action, which did not. *See Dooley v. O'Brien*, 226 Ariz. 149, 153-54, ¶¶ 14-18 (App. 2010). The court should have considered each attorneys' fees request separately. *See Ocean W. Contractors v. Halec Constr. Co.*, 123 Ariz. 470, 473-74 (1979) (distinguishing between a case involving essentially two separate actions, where each action should be dealt with individually regarding the award of attorneys' fees, and a case involving one action on a contract and a counterclaim on the same contract, where the court could determine the statutory "successful party" (citation omitted)). In any event, the court must redetermine attorneys' fees because our reversal on the corporate opportunity claim changes the calculus relied on by the court. Accordingly, we vacate the award of attorneys' fees and taxable costs and remand for reconsideration of the parties' requests for attorneys' fees and costs.

### III. *The Judgment for Jury Fees*

**¶37** Mark also argues the superior court erred in assessing one-half of the 2018 jury fees to him in the separate judgment for jury fees.[10]

---

[10] We lack jurisdiction over the judgment assessing jury fees because it does not contain finality language pursuant to Rule 54(b). *See Madrid v. Avalon Care Ctr.–Chandler, L.L.C.*, 236 Ariz. 221, 224, ¶ 8 (App. 2014) ("[T]his court lacks jurisdiction over an appeal from a judgment that does not resolve all claims as to all parties *and* that does not include Rule 54(b) language." (citation omitted)). However, because requiring Mark to obtain a signed judgment with Rule 54(b) language and file a new notice of appeal

¶**38** Mark claims that "[Tim's] error led to the mistrial," and that Mark "should not bear any part of the burden for [Tim's] fault." Tim does not dispute Mark's statements regarding fault in this regard and makes no argument in response. Jury fees may be assessed against a party that causes a mistrial. *See Carman v. Hefter*, 136 Ariz. 597, 598-99 (1983) (awarding jury fees against a plaintiff on two occasions). Under A.R.S. § 12-343(A), "[t]he costs of a new trial may either abide the result of the action or may be taxed against the party to whom a new trial is granted, as may be adjudged by the court at the time of granting a new trial." Because the result of the action has now changed with this decision, and the record reflects Tim was the party to whom a new trial was granted, we vacate that judgment and remand for the superior court to reconsider the assessment of the 2018 jury fees.

### IV. The Cross-Appeal

¶**39** Tim argues the superior court erred in denying his Rule 59 motion for new trial on Mark's claim for breach of contract. Tim does not challenge the adequacy of the evidence presented by Mark in support of his claim that he and Tim agreed to take $3,000 bi-monthly distributions from Proforma, divided according to each partner's ownership percentage, with Tim receiving 75 percent ($2,250.00) and Mark receiving 25 percent ($750.00) from each distribution. He further does not challenge the evidence supporting the resulting $111,000 damages award. Instead, the issue he raises is limited to whether the parties' agreement is unenforceable because it "violates the terms of controlling statutory law contrary to public policy." His argument relies on former A.R.S. §§ 29-703 and 29-709.[11] Even assuming Tim has not waived this issue,[12] we find no error.

---

would not provide an "equally plain, speedy, and adequate remedy," in the exercise of our discretion, we take special action jurisdiction over the judgment for jury fees. Ariz. R.P. Spec. Act. 1(a).

[11] Sections 29-703 and -709 have since been repealed as part of the recodification of the Arizona Limited Liability Company Act. *See* 2018 Ariz. Sess. Laws, ch. 168, § 3 (eff. Sept. 1, 2020). Section 29-703 has been restyled and renumbered as A.R.S. § 29-3404.

[12] Neither in his answer to Mark's second amended complaint nor in the third amended joint pretrial statement (the parties' operating document for trial) did Tim set up as affirmative defenses or otherwise plead public

**¶40**      We review for an abuse of discretion the superior court's denial of a motion for new trial. *Monaco v. HealthPartners of S. Ariz.*, 196 Ariz. 299, 304, ¶ 13 (App. 1999). A court abuses its discretion when it acts arbitrarily or inequitably, makes a decision unsupported by the facts, or misapplies the law. *See City of Phoenix v. Geyler*, 144 Ariz. 323, 328-29 (1985). Because a court abuses its discretion if it commits an error of law, we review *de novo* the superior court's rulings on questions of law presented in the motion for new trial. *Sandretto v. Payson Healthcare Mgmt., Inc.*, 234 Ariz. 351, 355, ¶ 8 (App. 2014).

**¶41**      "Contract provisions are enforceable unless prohibited by law or otherwise contrary to identifiable public policy." *CSA 13-101 Loop, LLC v. Loop 101, LLC*, 236 Ariz. 410, 411, ¶ 6 (2014) (citing *1800 Ocotillo, LLC v. WLB Grp., Inc.*, 219 Ariz. 200, 202, ¶ 7 (2008)). Arizona law "values the private ordering of commercial relationships and seeks to protect parties' bargained-for expectations." *Id.* (citing *1800 Ocotillo*, 219 Ariz. at 202, ¶ 8). "[I]f a contractual term is not specifically prohibited by legislation, courts will uphold the term unless an otherwise identifiable public policy clearly outweighs the interest in the term's enforcement." *Id.* at 411-12, ¶ 6 (citations omitted).

**¶42**      At trial, the jury received the following instruction regarding interim distributions, which effectively mirrored the language of former A.R.S. § 29-703(B) and (C)(1):

> A. Distributions of cash or other property to members by a limited liability company before the dissolution and winding up of a limited liability company shall be shared among the members and among classes of members in the manner provided in an operating agreement. *If an operating agreement does not so provide, distributions shall be shared among the members in the following order:*

---

policy or illegality in general or the statutes on which he now relies. Nevertheless, at the conclusion of the second trial, the superior court agreed to instruct the jury on part of A.R.S. § 29-703 over Mark's objection. In his motion for new trial, Tim asserted for the first time that the jury's award was illegal and contrary to Arizona's public policy as set forth in §§ 29-703, -706(D), and -709. Generally, an issue raised for the first time in a motion for new trial is deemed to have been waived. *Conant v. Whitney*, 190 Ariz. 290, 293 (App. 1997).

1. *Distributions shall be shared among the members in proportion to the amount of cash capital contributions and the value of other capital contributions,* as determined under subsection B of this section, *made by them and not returned until each member has been repaid his capital contributions.*

2. Other distributions shall be shared by the members equally.

B. For purposes of subsection A, a capital contribution other than a cash contribution has the value determined in the manner prescribed in an operating agreement. If an operating agreement does not specify the value of any such capital contribution and does not prescribe a manner for determining its value:

1. The value of a capital contribution of services is the fair market value of the services at the time they are rendered.

(Emphasis added.)

¶43        We note that Tim's argument ignores the fact that the plain language of the above instruction (and former § 29-703) contemplates distributions being made "before the dissolution and winding up of a limited liability company."  *See also* current A.R.S. § 29-3404 (entitled "[s]haring of and right to distributions before dissolution").  Tim points to nothing indicating that Proforma was or is in the process of dissolution and winding up.  Even assuming § 29-703 applies to this situation, however, we find it unavailing.

¶44        Read plainly, the language of § 29-703 provides that if there is no operating agreement—which in this case, there is at least no written operating agreement—then distributions are to be shared among the members—Mark and Tim—"in proportion to the amount of cash capital contributions and the value of other capital contributions . . . made by them."   These capital contributions may include cash or other contributions—such as sweat equity—and in this case, were reflected in the parties' ownership interests.  The distributions Mark and Tim agreed upon were not based on salary for work performed or the sharing of profits or losses, but ownership percentages based on the equity they contributed to the business–i.e., the value of their capital contributions as agreed on by the parties when they formed Munderloh Chiropractic.  Nothing precluded the parties from agreeing to take out distributions based on each party's ownership percentage.

**¶45** Tim also relies on former § 29-709 to bolster his argument, but even assuming he has not waived reliance on that statute, § 29-709 simply deals with the separate allocation of profits and losses among members and has no direct applicability here.[13] Again, the distributions Mark and Tim agreed upon were not based on the sharing of profits or losses, but on their relative capital contributions/ownership percentages. In other words, the agreement between Mark and Tim did exactly what Tim argues the statutes required: "[F]irst pay back capital contributions, including the fair market value of services rendered, and then distribute profits."[14]

**¶46** The agreement between Mark and Tim was neither illegal nor contrary to public policy, and Mark's recovery should not be denied on that basis. *See Mountain States Bolt, Nut & Screw Co. v. Best Way Transp.*, 116 Ariz. 123, 124 (App. 1977) ("[P]arties have the legal right to make such contracts as they desire to make, provided only that the contract shall not be for illegal purposes or against public policy." (quoting *S. H. Kress & Co. v. Evans*, 21 Ariz. 442, 449 (1920))). The jury was presented the breach of contract issue, made its determination based on the facts and law as presented to it, and we find no illegality or violation of public policy here. Accordingly, the superior court did not abuse its discretion in denying Tim's motion for a new trial.

### V. Attorneys' Fees on Appeal

**¶47** Both sides request attorneys' fees on appeal pursuant to A.R.S. § 12-341.01. Mark is the successful party on appeal, and specifically with regard to the contract action. Accordingly, in our discretion, we deny Tim's request and award Mark taxable costs and attorneys' fees in an

---

[13] Section 29-709 provides as follows: "The profits and losses of a limited liability company shall be allocated among the members and among classes of members in the manner provided in an operating agreement. If an operating agreement does not so provide, profits shall be allocated among the members according to the manner in which they share in distributions that exceed the repayment of their capital contributions, and losses shall be allocated among the members according to the relative capital contributions that they have made or promised to make in the future."

[14] The agreement also appears to comport with § 29-703(A) and former A.R.S. § 29-681(D)(2) (requiring the affirmative vote, approval, or consent of the majority of the members or managers to "[a]uthorize the distribution of limited liability company cash or property to the members").

amount to be determined upon compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

**¶48** For the foregoing reasons, we reverse the judgment in favor of Tim and against Mark on the corporate opportunity claim, affirm as to the cross-appeal, vacate the award of attorneys' fees and costs and the judgment on jury fees, and remand for the court to reconsider attorneys' fees, costs, and the 2018 jury fees.



AMY M. WOOD • Clerk of the Court
FILED: AA